Dean **GRAHAM, individually and d/b/a Elkhorn Stables; Jerry Zahourek, individually and d/b/a Elkhorn Lodge; and Associated Property Consultants, Petitioners,**

v.

**STATE of Colorado, acting by and on Behalf of the UNIVERSITY OF NORTHERN COLORADO, Respondent.**

No. 96SC650.

Supreme Court of Colorado,
En Banc.

April 6, 1998.

---

Clark S. Spalsbury, Jr., Estes Park, for Petitioners.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Garth C. Lucero, Deputy Attorney General, Timothy R. Arnold, Deputy Attorney General, Gregg E. Kay, First Assistant Attorney General, Jack M. Wesoky, Senior Assistant Attorney General, Civil Litigation Section, Tort Litigation, Denver, for Respondent.

Justice KOURLIS delivered the Opinion of the Court.

We granted certiorari in this case [1] to review *State v. Zahourek*, 935 P.2d 74 (Colo. App.1996), in which the court of appeals held that the University of Northern Colorado (UNC) was not a person subject to liability under 42 U.S.C. § 1983. We conclude that the court correctly decided the issue, therefore, we affirm the judgment of the court of appeals.

## I.

This controversy arose out of a dispute concerning the use of a trail across certain real property owned by UNC adjacent to Rocky Mountain National Park (UNC's property).

UNC's property in Larimer County, Colorado, consists of a lodge, several bunkhouses and other facilities, which UNC operates as a conference center. UNC's property is located between Jerry Zahourek's property, the Elkhorn Lodge, and Rocky Mountain National Park. Dean Graham owned Elkhorn Stables, a horse stable operated on a leased portion of Elkhorn Lodge.

On August 14, 1991, UNC filed suit against Dean Graham and two of his wranglers individually and Dean Graham d/b/a Elkhorn Stables, Inc. (collectively Graham). UNC alleged that Graham had repeatedly trespassed while conducting horseback riding tours by using UNC's property as a short-cut to Rocky Mountain National Park, and that as a result, UNC's property had suffered substantial deterioration and erosion. UNC sought relief in the form of preliminary and permanent injunctions and monetary damages against Graham.

Graham initially objected to the preliminary injunction and claimed a prescriptive easement over UNC's property. However,

Graham later consented to the entry of a preliminary injunction in exchange for UNC agreeing to drop its damages claims against him. On October 28, 1991, the district court entered a preliminary injunction prohibiting Graham from crossing UNC's property.

On November 13, 1991, UNC amended its complaint to allege a trespass claim against Jerry Zahourek individually, Associated Property Consultants, Inc. and Jerry Zahourek d/b/a Elkhorn Lodge (collectively Zahourek).[2] UNC claimed that Zahourek, as lessor of the stable facilities, was encouraging and directing others to trespass on UNC's land. UNC sought preliminary and permanent injunctions and monetary damages against Zahourek as well.

Zahourek opposed the injunction and claimed, as had Graham, that his entry upon UNC's land was not wrongful, but rather was permitted by a prescriptive easement. The court held a hearing on the preliminary injunction on April 27, 1992. At the close of the hearing, the district court entered a preliminary injunction restraining Zahourek's trespass on UNC's land. By order dated April 30, 1992, the court specifically found that Zahourek had trespassed on UNC's land and that Zahourek did not have a prescriptive easement against UNC or against UNC's predecessor in interest, the United States.

At that point in time, the court had entered injunctive relief and only UNC's damages claims against Zahourek remained pending. In March 1992, Zahourek amended his answer to state a counterclaim against UNC for what he termed an "unjust injunction." By order dated July 24, 1992, the court dismissed Zahourek's counterclaims which it described as "presumably ... a claim for abuse of process or malicious prosecution; damages for loss of patronage be-

**1.** We granted certiorari to consider the following issues: (1) whether the court of appeals erroneously decided that UNC was not a person subject to a 42 U.S.C. § 1983 damages suit contrary to the principles of this court's decision in *Uberoi v. University of Colo.*, 713 P.2d 894 (Colo.1986), thereby sustaining improper dismissal of petitioners' counterclaims; and (2) whether the court of appeals erroneously sustained an improper dismissal, on governmental immunity grounds, of petitioners' constitutional counterclaims for damages.

**2.** Jerry Zahourek owns Elkhorn Lodge. Associated Property Consultants, Inc. is a closely-held family corporation that leases and operates the Elkhorn Lodge. Jerry Zahourek controls 100% of its stock and is the president and sole director.

cause of an asserted illegal fence, and damage for bringing a frivolous claim." The court determined that those claims sounded in tort and therefore triggered the notice provisions of the Colorado Governmental Immunity Act (CGIA), sections 24–10–101 through –120, 7 C.R.S. (1997), with which Zahourek had not complied.[3] Zahourek refiled his counterclaims on November 26, 1992, approximately 90 days after sending UNC a notice of his claims.

On or about February 9, 1993, Zahourek moved for partial summary judgment on liability under UNC's trespass claim. For the first time, he asserted that the trail he used over UNC's property was a "public highway" pursuant to 43 U.S.C. § 932, an 1866 statute repealed in 1976. That statute provided in pertinent part: "The right of way for the construction of highways over public land, not reserved for public uses, is hereby granted." The court determined that issues of material fact were in dispute and denied Zahourek's motion.

The court held a hearing on UNC's permanent injunction and damages claims in June 1993.[4] By order dated July 13, 1993, the trial court found that no easements of record or other written grants of permission permitted defendants to cross UNC's land. However, the court found that by enacting 43 U.S.C. § 932, Congress created a public highway over UNC's land. The court determined that when the United States quitclaimed the property to UNC in 1956, UNC took the property subject to the public's right to use the trails. The court concluded that the defendants' horseback tour business constituted a public use. The court also found that the trails were a public highway under section 43–1–202, 11 C.R.S. (1997), which provides that all roads open to public traffic on May 4, 1921 shall be public highways.

Thus, the court concluded that use of the trails could not constitute trespass. The court denied UNC permanent injunctive relief and damages and vacated the temporary injunction.

On January 10, 1994, UNC again moved to dismiss Zahourek's counterclaim for wrongful injunction or in the alternative sought summary judgment. UNC argued that Zahourek failed to comply with the notice provisions of section 24–10–109 because Zahourek filed his notice of claim outside of the 180–day window. UNC also maintained that Zahourek's claim sounded in tort and, since sovereign immunity had not been waived, section 24–10–106 of the CGIA also barred his claim.

On January 14, 1994, Graham, who had not participated in the action in any manner since conceding to the entry of a preliminary injunction more than three years earlier, filed a Motion to Amend seeking to amend his answer and also assert counterclaims. In his motion, Graham alleged that UNC had improperly and maliciously pursued and obtained an injunction against him, and had violated 42 U.S.C. § 1983 by interfering with his federal statutory right to use the trails.

By order dated February 15, 1994, the court granted UNC's motion for summary judgment as to both Graham and Zahourek, concluding that UNC was entitled to judgment as a matter of law, in part because the claims were untimely under section 24–10–109(1) of the CGIA and therefore barred. The court further determined that because the claims could lie in tort, they also were barred by section 24–10–106(1) of the CGIA.

On February 28, 1994, Graham filed a C.R.C.P. Rule 59 motion for post trial relief in which he claimed, in pertinent part, that he had alleged a violation of his constitutional right to just compensation which could not be dismissed on governmental immunity grounds.

On March 15, 1994, Zahourek moved for reconsideration of the court's February 15 order dismissing his counterclaims. Zahourek argued that the court had failed to under-

---

**3.** In the same order, the court granted UNC's pending motion for partial summary judgment against Zahourek, concluding that it is impossible to obtain a prescriptive easement against the United States absent a specific waiver of sovereign immunity, and that the United States had made no such waiver.

**4.** Only Zahourek participated in the hearing. Graham did not participate.

stand—or appreciate that he had made—a just compensation/inverse condemnation argument; that unlawful obstruction of a public highway violated section 43–5–301, 12 C.R.S. (1997), and therefore was not a tort; that pursuant to section 23–40–104, UNC is a person subject to § 1983 claims; that the wrongful injunction claim was not a tort; and that he had complied with all CGIA notice requirements.

Also on March 15, 1994, Graham filed a reply to UNC's response to his Rule 59 motion asserting that governmental immunity notice was not required on his claims; that a federal right was involved for purposes of § 1983 because it was a federal statute that created the federal highway/trail; and that his claims were not time-barred.

The district court summarily denied both Zahourek's motion for reconsideration and Graham's motion for post trial relief on April 7, 1994.

UNC appealed the district court's July 13, 1993 order (amended February 11, 1994) to the court of appeals arguing that the district court had erred in denying the request for permanent injunction and in determining that a public highway existed across its property.[5]

Zahourek and Graham together cross-appealed from the February 15 and April 7, 1994 orders. Zahourek and Graham argued that their proposed counterclaims were based on an inverse condemnation theory and as such were not barred by the CGIA. The court of appeals concluded that none of the defendants' proposed counterclaims were based on an inverse condemnation theory and therefore declined to address the merits of that argument. *See State v. Zahourek,* 935 P.2d 74, 77 (Colo.App.1996). The court of appeals determined that all of the defendants' other claims were for injuries which lie or could lie in tort and were therefore barred by sovereign immunity pursuant to section 24–10–108. *See id.* at 78. Further, section 24–10–109 required that Zahourek and Graham notify the public entity of their claims within 180 days of the date their injuries

were discovered regardless of whether all of the elements of the injury were then present, which they failed to do. *See id.*

Zahourek and Graham also argued that the district court had erred in not allowing them to amend their answers to add certain counterclaims. The court of appeals determined that Graham's proposed counterclaim alleged wrongful injunction and violation of his federal statutory rights under 42 U.S.C. § 1983. The court concluded that the wrongful injunction claim was barred by Graham's consent to entry of the preliminary injunction. *See id.*

The court of appeals determined that Zahourek's proposed amendment would have added counterclaims based on an alleged conspiracy, malicious prosecution, and violation of rights under § 1983. As to conspiracy and malicious prosecution, the court concluded that both of those claims would lie in tort and would therefore be barred by the CGIA. *See id.*

With respect to both Graham's and Zahourek's § 1983 claims, the court of appeals concluded that such claims were barred because UNC was not a person within the meaning of § 1983. *See id.* at 78–79. The court reasoned that *Will v. Michigan Department of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), either superseded or overruled the decision of this court in *Uberoi v. University of Colorado,* 713 P.2d 894 (Colo.1986), which held that a state university is a person within the meaning of § 1983. *See Zahourek,* 935 P.2d at 79. The court of appeals concluded that because UNC is an instrumentality of the State, a § 1983 claim would not lie against it or its board of trustees. Thus, as with the defendants' other proposed claims, amendment would have been futile.

This court accepted certiorari on the defendants' petition to address the two issues of whether UNC is a person for purposes of § 1983; and whether dismissal of the consti-

---

**5.** The court of appeals affirmed the trial court and UNC's underlying trespass claim is not now    before us.

tutional counterclaims on grounds of governmental immunity was correct.[6]

Hence, we have before us a case that began as a trespass case involving horseback tours across lands adjacent to Rocky Mountain National Park, which now presents an issue largely unrelated to the original dispute.

## II.

We begin with § 1983. Congress enacted the predecessor to § 1983 shortly after the Civil War to combat abuses of official power and as one of the means whereby Congress exercised the power vested in it by section 5 of the Fourteenth Amendment to enforce the provisions of that amendment. *See Monroe v. Pape,* 365 U.S. 167, 170–71, 81 S.Ct. 473, 475, 5 L.Ed.2d 492 (1961). Although Congress did not identify federal courts as the exclusive forum to remedy these deprivations, *see Felder v. Casey,* 487 U.S. 131, 147, 108 S.Ct. 2302, 2311, 101 L.Ed.2d 123 (1988), it is plain that "Congress assigned the federal courts a paramount role" in the endeavor. *Patsy v. Board of Regents,* 457 U.S. 496, 503, 102 S.Ct. 2557, 2561, 73 L.Ed.2d 172 (1982). The relevant portion of § 1983 provides that: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...." The Act was intended to subject those acting under color of law to liability for depriving individuals of their civil rights. However, the determination of who might be liable under the language of that Act has bedeviled the courts for over a century.

In *Monroe,* the Supreme Court held that a municipality was not a person under § 1983. The Supreme Court extended that holding to include States in *Fitzpatrick v. Bitzer,* 427 U.S. 445, 452, 96 S.Ct. 2666, 2669, 49 L.Ed.2d 614 (1976). In 1978, the Supreme Court overruled *Monroe* in part, by holding that a municipality was a person for purposes of § 1983 liability. *See Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). However, the question of whether a State itself could be liable under § 1983 was unanswered until the announcement of *Will v. Michigan Department of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). In *Will,* the Supreme Court concluded that a State cannot be liable under § 1983, thereby creating a dichotomy between a State or an arm of the state, and a municipality or a political subdivision.

The reasoning that the Supreme Court employed in *Will* related to the Eleventh Amendment to the United States Constitution. The Court reasoned that while § 1983 provides a federal forum to remedy many deprivations of civil liberties, it does not provide a federal forum for litigants who seek a remedy against a State. The Court recognized that States are immune from suit in federal court, absent waiver or clear intent of Congress, by operation of the Eleventh Amendment. The Eleventh Amendment, ratified in 1798, states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." It was adopted as a check against the power of the federal government, and a recognition of the sovereign authority of the States.

In passing § 1983, Congress did not intend to disturb the States' Eleventh Amendment immunity and so to alter the federal-state balance in that respect. *See Quern v. Jordan,* 440 U.S. 332, 341–45, 99 S.Ct. 1139, 1145–47, 59 L.Ed.2d 358 (1979). Further, given that a principal purpose behind the enactment of § 1983 was to provide a federal forum for civil rights claims against persons acting under color of state law, the Supreme

---

**6.** The court of appeals dismissed the defendants' "wrongful injunction" and "illegal fencing" claims as barred by the CGIA. Neither of those claims can be viewed as constitutional. Furthermore, the propriety of the dismissal of these two claims is not before us. In addition, we agree with the court of appeals that the defendants did not plead inverse condemnation counterclaims. We therefore decline to reach the second issue.

Court has rejected the argument that Congress, nevertheless, intended to create a cause of action against States to be brought in state courts, "which are precisely the courts Congress sought to allow civil rights claimants to avoid through § 1983." *Will*, 491 U.S. at 66, 109 S.Ct. at 2310. Hence, reasoned the Court, States were immune from suit in state court as well. Therefore, since Congress did not specifically include States in the ambit of § 1983 liability, the immunity of the Eleventh Amendment would prevail: by operation of law with respect to federal court actions, and by operation of parity and consistency to state court actions. The two settled issues then are that a State is not liable under § 1983, and the reason is because of operation of the Eleventh Amendment.

Since *Will*, courts have struggled to determine whether a defendant in a § 1983 action is a State or arm of the state and thereby immune; or whether it is a political subdivision of the State and thereby answerable.

Graham and Zahourek argue that the principles stated in *Uberoi* should control the outcome of this case and that the court of appeals erred in determining that *Uberoi* is no longer good law. In *Uberoi* we held that state universities, like local governing bodies, are "persons" and can be sued directly under § 1983. However, in *Will*, the United States Supreme Court called *Uberoi* into question. In *Simon v. State Compensation Insurance Authority*, 946 P.2d 1298 (Colo.1997), we decided to leave for another day the determination of whether *Will* overruled *Uberoi's* holding that the University of Colorado was a person for purposes of § 1983. *See Simon*, 946 P.2d at 1302 n. 3.

In *Simon* we recognized that under *Will*, an Eleventh Amendment arm-of-the-state analysis must be applied to determine whether a state-created entity is a person under § 1983. *See id.* at 1302. We also adopted a new analytical structure for determining whether an entity is a person for § 1983 purposes. In light of these more recent authorities, we now overrule *Uberoi* to the extent that it stands for the *ipso facto* proposition that all state universities are persons susceptible to suit under § 1983.

We have concluded that the Colorado Compensation Insurance Authority (CCIA) was a person that could be sued under § 1983 by reference to various factors. *See Simon*, 946 P.2d at 1303.

▪ After examining the factors used by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), and by federal circuit courts in numerous decisions, we adopted a three-factor analysis. We determined that the appropriate analysis requires examination of (1) how state law characterizes the entity; (2) whether the entity is autonomous and free from the control of the State; and (3) whether a judgment against the entity would ultimately be paid by the State. *See Simon*, 946 P.2d at 1305. In *Simon*, we did not give particular weight to any one factor, but rather held that "these factors are part of a balancing test ... [and] it is therefore necessary to consider all three factors before reaching a conclusion as to the entity's immunity status." *Id.*

### A.

▪ Applying these factors to the matter before us, we first examine how state law characterizes UNC. For this inquiry, we look to legislative declarations of purpose, statutory language creating the entity, and, where available, judicial decisions regarding the entity's characteristics and powers. *See id.*

The statutory sections directly concerning UNC appear at Article 40 of Title 23. UNC was established as the State's "primary institution for undergraduate and graduate teacher education in the state of Colorado." § 23–40–101, 7 C.R.S. (1997). UNC also has the responsibility, on a statewide basis, of providing graduate level programs needed by professional educators and administrators. *See id.*

The legislature has established that UNC is to be governed by a nine-member board of trustees. *See* § 23–40–104(1)(a), 7 C.R.S. (1997). The board is defined by statute as "a

body corporate." Section 23–40–104(1)(a) provides in pertinent part:

> There is hereby established a board of trustees for the university of northern Colorado, which shall consist of nine members and shall be the governing authority for the university of northern Colorado. The board created by this subsection (1) shall be and is hereby declared to be a body corporate and, as such and by the names designated in this section, may hold property for the use of the university which it governs, be a party to all suits and contracts, and do all things lawfully appertaining to such university in like manner as municipal corporations of this state.

§ 23–40–104(1)(a), 7 C.R.S. (1997).

This declaration, analogizing UNC to a municipal corporation, tends to support the conclusion that UNC is comparable to a municipality and therefore not entitled to Eleventh Amendment immunity. *See Monell,* 436 U.S. at 690, 98 S.Ct. at 2035 (concluding that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies); *see also Simon,* 946 P.2d at 1305 (recognizing that the Supreme Court in *Mount Healthy* and *Lake Country* concluded that the entities were not arms of the State because the enabling statutes failed to articulate a clear intention to cloak the entities with Eleventh Amendment immunity).

However, there is a wealth of authority that would dictate a different outcome. For example, several courts have held that a State's choice of a corporate form for its colleges or universities or their governing boards does not waive sovereign immunity. *See Jain v. University of Tennessee at Martin,* 670 F.Supp. 1388, 1392 (W.D.Tenn.1987)(creation of corporate form was simply convenient means to allow university to pursue ends of higher education; therefore sovereign immunity not waived); *Jagnandan v. Giles,* 538 F.2d 1166, 1174 (5th Cir.1976).

This same conclusion was reached by the Tenth Circuit Court of Appeals in *Hamilton Manufacturing Co. v. Trustees of the State Colleges in Colorado,* 356 F.2d 599 (10th Cir.1966). In *Hamilton,* the assignee of a portion of proceeds due on a contract filed suit against the Trustees. The Tenth Circuit held that the suit was essentially an action against the State of Colorado and was therefore barred by the Eleventh Amendment. *See Hamilton,* 356 F.2d at 600. There, the court acknowledged that the General Assembly had declared the board of trustees a "body corporate," empowered by statute to "hold property" and "be party to all suits and contracts, and do all things thereto lawfully appertaining, in like manner as municipal corporations of the state." *Id.* at 601 (citing 1963 C.R.S. § 124–5–1). However, despite the corporate designation, the court concluded that Eleventh Amendment immunity applied, implicitly reasoning that other factors were more important. In *Hamilton,* those other factors included that the Trustees were: (1) an integral part of the state public school system; (2) appointed by the governor with the advice and consent of the senate; (3) supported by state funds; and (4) that the action was essentially one for recovery of money from the State. *See id.* Hence, although the General Assembly chose a corporate form for UNC's governance, we find no intent to waive sovereign immunity or to subject UNC to exposure under § 1983.

### B.

The second factor we must consider is whether UNC is autonomous and free from state control. *See Simon,* 946 P.2d at 1305. "The greater the state administrative and financial influences on the entity, the more likely it is that the entity will be treated as an arm of the state." *Id.*

The State exerts a substantial amount of administrative influence over UNC. For example, pursuant to section 23–40–101, 7 C.R.S. (1997), the Colorado Commission on Higher Education is charged with defining UNC's role and mission. In so doing, the Commission must ultimately implement the policies of the General Assembly. *See* § 23–40–101, 7 C.R.S. (1997). The Commission must also include an appropriate level of general fund support for UNC's programs in its funding recommendations. *See id.* In addition, of the nine members of UNC's

board of trustees, seven are appointed by the governor with senate consent.[7] *See* § 23–40–104(1)(b); *see also Watson v. University of Utah Med. Ctr.*, 75 F.3d 569, 574–75 (10th Cir.1996)(finding that gubernatorial appointments of the board of trustees with responsibility for administrative functions supported finding of sufficient state control for arm-of-the-state status). Finally, the trustees of the state colleges of Colorado, not UNC's board of trustees, have authority over the setting of fees and other fiscal matters at UNC directly related to present and future facilities and pledges. *See* § 23–40–104(2).

UNC's board does have some administrative autonomy. For example, the board of trustees has the power to sue and be sued, to hold property and to enter contracts. *See* § 23–40–104(1)(a). In addition, the board operates without direct oversight of its daily activities. *See* § 23–40–104(1)(a)(providing that the board "may make bylaws and regulations for the well-ordering and government of the university ... and may conduct the business of said university in a manner not repugnant to the constitution and laws of this state"). By operation of the constitution, faculty members of state educational institutions and certain administrative employees are exempted from the state personnel system. *See* Colo. Const. art. XII, § 13; § 24–50–135, 7 C.R.S. (1997)(exempting officers of educational institutions and their professional staff; heads of administrative units and their staff; heads of and staff members of departments of athletics; and heads of those functions supported primarily by student fees and charges, including heads of residence halls).

Although UNC's board does enjoy some administrative autonomy, it has little financial autonomy. UNC receives its funding from the State, by appropriation from the General Assembly upon recommendation of the Colorado Commission on Higher Education. *See* §§ 23–40–103, 23–1–104 and 23–1–105, 7 C.R.S. (1997). Funds and revenues for the establishment and maintenance of UNC, including funds for the payment of its officers, teachers and employees and "for all purposes incident thereto" are apportioned in such a manner as the General Assembly provides. *See* § 23–40–103. The funds de-

rive both from tuition and other cash receipts, and from general fund allocation.

The money is managed through a fund held by the state treasury and controlled by the board of trustees for UNC. *See* § 23–40–103.5. Section 23–40–103.5 provides that all money received or acquired by the board of trustees or UNC,

> whether by appropriation, grant, contract, or gift, by sale or lease of surplus real or personal property, or by any other means, whose disposition is not otherwise provided for by law ... shall be credited to said fund. The moneys in the fund are hereby continuously appropriated to the board of trustees for [UNC] and shall remain in the fund and shall not be transferred or revert to the general fund at the end of any fiscal year.

§ 23–40–103.5(1), 7 C.R.S. (1997). Pursuant to this section, revenue UNC receives from sources such as tuition payments, athletic event fees—and fees charged to use the conference center bordering on Rocky Mountain National Park—remain part of the segregated UNC fund and do not revert to the general fund.

The money in the UNC fund is used, among other things, to pay salaries and operating expenses of the board and of UNC "and for the payment of any other expenses incurred by the board of trustees in carrying out its statutory powers and duties." § 23–40–103.5(2). If not all of the funds are needed for immediate use, the board notifies the state treasurer of such amount and the state treasurer invests the specified amount in authorized investments. *See* § 23–40–103.5(3).

Thus, UNC's funding derives from the State. The General Assembly appropriates such monies as it deems necessary for the operation of UNC, and those monies are then spent as budgeted by the board of trustees.

### C.

■ Finally, we consider the third factor: whether the judgment against UNC would ultimately be paid by the State. At the crux of this inquiry is the concept that governmental immunity ultimately protects

---

7. The two other members are non-voting student and faculty representatives. *See* § 23–40– 104(1)(b), 7 C.R.S. (1997).

taxpayers. If the entity has its own revenue source out of which a judgment would be paid, immunity is less compelling. If no such source is available and the general fund would be depleted, then immunity should be applied on the theory that, in fact, the State is the real party in interest because it would answer the judgment. This doctrine was first announced in *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945) and was more recently reiterated and emphasized in *Regents of the University of California v. Doe*, 519 U.S. 425, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997)("The question whether a money judgment against a state instrumentality or official would be enforceable against the State is of considerable importance to any evaluation of the relationship between the State and the entity or individual being sued.") and *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 48, 115 S.Ct. 394, 404, 130 L.Ed.2d 245 (1994)(recognizing that the most important factor in determining whether a governmental entity is entitled to Eleventh Amendment immunity is whether a judgment against it would be paid from the state treasury).[8]

The Colorado General Assembly has created a risk management fund to pay judgments entered against state agencies. *See* § 24–30–1510(3)(a), 7 C.R.S. (1997). For purposes of the Division of Risk Management, "state agency" is defined to include "any state institution of higher education or other instrumentality thereof, except as provided in section 24–30–1517(2)."[9] § 24–30–1502(5), 7 C.R.S. (1997). Since section 24–30–1502(5) defines state agency to include UNC, a judgment against UNC on a § 1983 claim would likely be satisfied out of the state treasury.

■ Graham and Zahourek argue that the subject property is financially self-sustaining and that UNC would be able to satisfy a judgment out of conference center proceeds and other fees without resorting to state funds. We are not persuaded. First, Graham's and Zahourek's proposed counter-

claims were directed against UNC, not the separate conference center property. We find no support for the proposition that our inquiry can be limited to a particular asset of a defendant. *See, e.g., Greenhill v. Carpenter*, 718 S.W.2d 268, 272 (Tenn.App.1986)("If a plaintiff were to be permitted to sift through the coffers of the state institution in order to discover which of its funds originated from private sources and which did not, the very purpose of sovereign immunity would be defeated."). As the United States Supreme Court pointed out in *Regents of the University of California v. Doe*, the appropriate inquiry is whether a money judgment against a state instrumentality or official would be enforceable against the State. Here, a judgment against UNC would likely be enforceable against the State and satisfied with funds in the risk management fund.

■ Finally, Graham and Zahourek argue that UNC receives tuition income, grants and gifts from sources other than the State which could be used to satisfy a judgment. The mere fact that an entity otherwise funded by general fund dollars receives some cash fund receipts does not convert that entity into something other than a state agency. Most, if not all, state agencies do receive some income from cash receipts; however, they remain subject to the authority and discretion of the General Assembly for budgetary purposes.

Thus, it appears likely that a judgment would be satisfied out of the risk management fund and the state treasury would thereby be depleted.

### III.

■ In summary, while state law characterizes UNC as a body corporate, such characterization appears to be for the purpose of providing a convenient means for allowing UNC to pursue the ends of higher education. Although UNC acts with some administrative and financial autonomy, it is nonetheless subject to state administrative direction and to state funding decisions. Finally, it appears

8. We note that Tenth Circuit authority, while mirroring the three-factor analysis we adopted in *Simon*, recognizes this factor as most important. *See Sonnenfeld v. City & County of Denver*, 100 F.3d 744, 749 (10th Cir.1996); *Haldeman v. State of Wyo. Farm Loan Bd.*, 32 F.3d 469, 473 (10th Cir.1994).

9. Section 24–30–1517(2) excepts from coverage the University of Colorado at Boulder, Denver, and Colorado Springs and the University of Colorado Health Sciences Center.

that a § 1983 judgment against UNC would be paid out of the risk management fund and that the State is ultimately the real party in interest. Balancing these three factors, we conclude that UNC is an arm of the state, not a person, and is therefore immune from § 1983 liability.[10]

We therefore affirm the judgment of the court of appeals.

---

**10.** Our conclusion squares with the body of Tenth Circuit decisions which, applying a similar analysis, have consistently found state universities to be arms of the state. *See, e.g., Watson v. University of Utah Med. Ctr.,* 75 F.3d 569, 575, 577 (10th Cir.1996)(recognizing general proposition and specifically finding University of Utah Medical Center entitled to Eleventh Amendment immunity); *Mascheroni v. Regents of the Univ. of Cal.,* 28 F.3d 1554 (10th Cir.1994) (University of California); *Seibert v. State of Okla. ex rel. Univ. of Okla. Health Sciences Ctr.,* 867 F.2d 591, 594 (10th Cir.1989) (University of Oklahoma); *Prebble v. Brodrick,* 535 F.2d 605, 610 (10th Cir.1976) (University of Wyoming); *Brennan v. University of Kan.,* 451 F.2d 1287, 1290 (10th Cir.1971) (University of Kansas and University of Kansas Press); *see also Korgich v. Regents of New Mexico Sch. of Mines,* 582 F.2d 549, 551–52 (10th Cir. 1978) (New Mexico School of Mines).