**PUBLISH**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 10 2000**

**PATRICK FISHER**
**Clerk**

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

KATHERINE S. STURDEVANT,

     Plaintiff - Appellee,

v.

MARIJANE A. PAULSEN, individually and in her official capacity as President of Pikes Peak Community College; EDWIN RAY, individually and in his official capacity as Vice President for Educational Services of Pikes Peak Community College; JANE ABBOTT, individually and in her official capacity as Dean of the Division of Communications, Humanities and Social Sciences of Pikes Peak Community College,

     Defendants,

  and

STATE BOARD OF COMMUNITY COLLEGES AND OCCUPATIONAL EDUCATION,

     Defendant - Appellant.

No. 99-1276

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 98-B-1105)**

Christine M. Arguello, Deputy Attorney General (Ken Salazar, Attorney General and Antony B. Dyl, Assistant Attorney General with her on the briefs), Denver, Colorado, for the Appellant.

Sharyn E. Dreyer (Martha R. Houser, Cathy L. Cooper, and Bradley C. Bartels with her on the brief), Colorado Education Association, Denver, Colorado, for the Appellee.

Before **SEYMOUR** and **LUCERO**, Circuit Judges, and **ELLISON**[*], Senior District Judge.

**LUCERO**, Circuit Judge.

This interlocutory appeal of the district court's denial of Eleventh Amendment immunity presents the legal issue of whether the Colorado State Board for Community Colleges and Occupational Education ("the Board") is an "arm of the state" for purposes of the Eleventh Amendment. Resolution of this issue requires an inquiry into the financial relationships between the state and the Board, as well as the Board's degree of autonomy, but fundamentally comes down to the following question: Is the Board more like a political subdivision such as a local school district, or is it an alter ego of the state such as the governing board

---

[*] The Honorable James O. Ellison, U.S. District Judge, United States District Court for the Northern District of Oklahoma, sitting by designation.

of a state university system?  We conclude it is more akin to the latter, and reverse.

## I

Plaintiff Katherine S. Sturdevant, a full-time history instructor at Pikes Peak Community College, asserts state law wrongful termination claims against the Board, as well as federal claims against other defendants that are not at issue in this interlocutory appeal of the district court's denial of Eleventh Amendment immunity.  The Board asserted the defense of Eleventh Amendment immunity based on its claim that it is an alter ego or instrumentality of the State of Colorado.  Adopting a magistrate's recommendation, the district court rejected the Board's claim of Eleventh Amendment immunity, and this interlocutory appeal followed.

Colo. Rev. Stat. § 23-60-104 establishes and sets forth the powers and duties of the Board, which governs the State of Colorado's community college and occupational education system.  See id. § 23-60-102.  The Board "is charged to develop and establish state policy for occupational education and to govern the state system of community colleges."  Colo. Rev. Stat. § 23-60-102(1).  It is defined as a "body corporate" with the power to hold "money, lands, or other property" and to use such property in the interests of community and occupational education.  Colo. Rev. Stat. § 23-60-104(1)(b).  Nine of its eleven members are

appointed by the governor with the consent of the Senate, subject to certain political and geographical diversity requirements. See Colo. Rev. Stat. § 23-60-104(2)(a)(I). A student and faculty member from among the state community colleges, elected according to Board-established procedures, fill the additional two positions. See Colo. Rev. Stat. § 23-60-104(2)(a)(II).

The Board controls and administers a "state board for community colleges and occupational education fund." Colo. Rev. Stat. § 23-60-107(1). This fund contains money obtained by legislative appropriation as well as grant, contract, gift, sale, or other means. See id. Fund balances do not revert to the general fund at the end of the year. See id.

Board powers and duties over the state system of community and technical colleges include, in part, constructing facilities and issuing "revenue bonds and other revenue obligations," Colo. Rev. Stat. § 23-60-202(1)(b); fixing the "tuition and fees to be charged in the community and technical colleges" in accordance with the level of legislative appropriation therefor, Colo. Rev. Stat. § 23-60-202(1)(c); and planning and implementing policies for the community and technical educational system generally, see Colo. Rev. Stat. § 23-60-202. In many respects, however, the Board's powers are subordinate to the oversight of the Colorado Commission on Higher Education ("CCHE"). The CCHE may approve or modify the Board's proposed budget before making a funding

recommendation to the governor and general assembly, see Colo. Rev. Stat. § 23-1-105(2), establishes binding policies on tuition and fees, see id. § 23-1-108(12), and must approve the service area of, and all educational programs at, Board-governed institutions, see id. §§ 23-1-107, -109. Finally, with respect to its oversight of community and technical colleges, the Board enjoys and is subject to the same powers and duties as "the governing boards of institutions of higher education," Colo. Rev. Stat. § 23-60-202(1).

In determining that the Board does not enjoy the State's Eleventh Amendment immunity, the district court concluded that it constitutes a political subdivision rather than an arm of the state. Specifically, the district court looked to the following factors: the Board's status as a "body corporate," its powers to raise and administer revenues, its "significant degree of autonomy," the fact that its funds do not annually revert to the state, and, most importantly, a conclusion that although the state risk management fund would pay any judgment against the Board, "the state of Colorado would not be legally liable to pay a judgment against the Board." (Appellant's App. at 88-89.) Considering these factors de novo and in light of the fundamental purpose of Eleventh Amendment arm-of-the-state doctrine, we disagree.

## II

We have appellate jurisdiction over this interlocutory appeal pursuant to the

collateral order doctrine. "States and state entities that claim to be 'arms of the State' may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity." Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 147 (1993).

**III**

Eleventh Amendment immunity is a question of federal law reviewed de novo. See Duke v. Grady Mun. Schs., 127 F.3d 972, 975 (10th Cir. 1997). We give some deference to the rationale of state court decisions regarding the arm-of-the-state status of a particular entity, but do not regard them as dispositive. See id. at 978.

Eleventh Amendment immunity bars damages actions against a state in federal court, even by its own citizens, unless the state waives that immunity. See U.S. Const. amend. XI; Edelman v. Jordan, 415 U.S. 651, 663 (1974).[1] In Mount Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 280 (1977) (citations omitted), the Court held that "[t]he bar of the Eleventh Amendment to suits in federal courts extends to States and state officials in appropriate circumstances, but does not extend to counties and similar municipal corporations." In interpreting Mt. Healthy, we have explained that "[t]he arm-of-

_____

[1] Waiver was not addressed by the district court and Sturdevant does not argue that the State has waived the Board's immunity.

- 6 -

the-state doctrine bestows immunity on entities created by state governments that operate as alter egos or instrumentalities of the states." Watson v. University of Utah Med. Ctr., 75 F.3d 569, 574 (10th Cir. 1996) (citing Mascheroni v. Board of Regents of the Univ. of Cal., 28 F.3d 1554, 1559 (10th Cir. 1994)).

Our inquiry under the arm-of-the-state doctrine is well defined.

The issue here . . . turns on whether the [entity] is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend. The answer depends, at least in part, on the nature of the entity created by state law.

Mt. Healthy, 429 U.S. at 280; see also Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429-30 & n.5 (1997). In other words, the inquiry with regard to a particular entity is whether it is "more like a county or city than . . . like an arm of the state?" Mt. Healthy, 429 U.S. at 280. Although ultimately a matter of federal law, arm-of-the-state status must be determined in each case by reference to the particular state laws characterizing the entity. See Duke, 127 F.3d at 975, 978; Ambus v. Granite Bd. of Educ., 995 F.2d 992, 994 (10th Cir. 1993) (en banc).

In Watson, we further elaborated on the Mt. Healthy test for arm-of-the-state status. To determine whether an entity is an arm of the state

we engage in two general inquiries. [T]he court first examines the degree of autonomy given to the agency, as determined by the characterization of the agency by state law and the extent of guidance

and control exercised by the state. Second, the court examines the extent of financing the agency receives independent of the state treasury and its ability to provide for its own financing. The governmental entity is immune from suit if the money judgment sought is to be satisfied out of the state treasury.

Watson, 75 F.3d at 574-75 (internal quotations and citations omitted). With respect to the last and particularly important factor of state treasury liability, "[w]e interpret Doe, 519 U.S. at 431, to require us to focus on legal liability for a judgment, rather than practical, or indirect, impact a judgment would have on a state's treasury." Duke, 127 F.3d at 981. Although our consideration of the various enumerated factors requires consideration of certain aspects of a state entity in multiple contexts, we nevertheless pursue the factors in detail, because they lead us to a different conclusion than that of the district court.

## A. Legal Liability for a Judgment

Because we held in Duke, id., that state treasury liability strongly favors arm-of-the-state status, we address that issue first. The Board claims that damages against it would be paid out of the state risk management fund. This fund is authorized "[t]o pay liability claims and expenses related thereto, brought against the state, its officials, or its employees pursuant to the 'Colorado Governmental Immunity Act' . . . and claims against the state, its officials, or its employees arising under federal law." Colo. Rev. Stat. § 24-30-1510(3)(a). It appears that one colorable reading of the statue is that the Board is a covered state

agency for purposes of the risk management fund by virtue of being a "state institution of higher education <u>or other instrumentality thereof</u>." Colo. Rev. Stat. § 24-30-1502(5) (emphasis added). Sturdevant, however, argues that her claims are not federal claims and therefore not explicitly covered by Colo. Rev. Stat. § 24-30-1510(3). According to Sturdevant, insofar as the risk management statute incorporates the Colorado Governmental Immunity Act, that statute covers only state law tort and not state law contract claims, and therefore a judgment in her favor would not implicate the risk management fund. <u>See</u> Colo. Rev. Stat. § 24-30-1510(3)(a) (providing that the risk management fund will pay claims against the state, its officials, or its employees "arising under federal law" and pursuant to the Colorado Governmental Immunity Act ); <u>id.</u> § 24-10-105 (stating that it is the intent of governmental immunity act to cover tort actions); <u>but see</u> <u>id.</u> § 24-30-1510(4)(b) (stating that the risk management fund will not be used to pay contract claims, "except for claims relating to employment contracts"). Although such a distinction appears to have some support in the Colorado statutory provisions at issue, Sturdevant's Eleventh Amendment argument necessarily relies on the proposition that the details of a risk management fund can render a particular state entity an arm of the state for purposes of certain claims and a political subdivision for purposes of other claims. We have found no cases supporting such an approach. Moreover, we do not consider such a distinction

consistent with the fundamental goal of the Mt. Healthy analysis: distinguishing political subdivisions from governmental entities that are effectively arms of the state. See Mt. Healthy, 429 U.S. at 280. We therefore expressly decline to answer the state law question of the precise application of the risk management statute to particular claims. Cf. Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1233 (10th Cir. 1999).

More importantly for purposes of the federal constitutional question, it is not at all clear that even if a risk management fund must pay a judgment, this obligation renders that judgment a judgment against the state for Eleventh Amendment purposes. "The key question is whether funds to satisfy a money judgment would come directly from the state, or indirectly through commingled state and local funds or state indemnification provisions." Sutton, 173 F.3d at 1233 (citing Ambus, 995 F.2d at 996) (emphasis added). In answering this question, we focus on the legal incidence, not the practical effect, of the liability. See Duke, 127 F.3d at 981. Duke held that indemnification by the New Mexico Public Schools Insurance Authority was not tantamount to legal liability upon the state of New Mexico. See id. at 980-82. But cf. Watson, 75 F.3d at 575 (holding, prior to Doe, that the University of Utah is an arm of the state in part because its participation in the Utah Risk Management Fund indicates that it would "appear that any judgment against the University might be satisfied, at least indirectly,

from state resources"); <u>Graham v. State</u>, 956 P.2d 556, 565 (Colo. 1998) (en banc) (holding that a judgment against the University of Northern Colorado "would likely be enforceable against the State and satisfied with funds in the risk management funds"). However the risk management fund may operate in practice—even were indemnification a certainty—this would not definitively resolve the question in favor of arm-of-the-state status. <u>See</u> <u>Sutton</u>, 173 F.3d at 1233; <u>Duke</u>, 127 F.3d at 981.

Because its moneys are placed in a fund within the state treasury, <u>see</u> Colo. Rev. Stat. § 23-60-107(1), the Board additionally argues that any judgment against it, whether reimbursed by the Risk Management Fund or not, will be assessed directly against the state's treasury. This argument is more directly relevant to <u>Duke</u>'s emphasis on the legal incidence of any judgment, and finds some support in <u>Graham</u>'s statement that a judgment against the University of Northern Colorado—whose moneys are likewise placed in a fund within the state treasury, <u>see</u> Colo. Rev. Stat. § 23-40-103.5(1)—would "likely be enforceable against the state" as well as satisfied by risk managment funds. <u>Graham</u>, 956 P.2d at 565. Unfortunately, the Colorado Supreme Court's statement that there is a likelihood of enforceability falls short of amounting to an explicit resolution of the question of the legal incidence of the judgment. Moreover, it appears that the

Board's fund within the state treasury may well contain commingled funds from state and local sources. Cf. Sutton, 173 F.3d at 1233.

We need not resolve conclusively the questions of operation of the risk management fund and the state's legal liability for a potential judgment. In Sutton, 173 F.3d at 1233, confronted with an analogous lack of clarity as to the legal liability for the judgment against a governmental defendant, we proceeded to resolve the question based on the remaining factors of the Mt. Healthy test, without definitively resolving the state law question of liability for the judgment: "It is not clear from Utah's statutory scheme and case law how the State School for the Deaf and Blind satisfies money judgments against it. Nevertheless, we are persuaded that the State School for the Deaf and Blind is an 'arm of the state' entitled to Eleventh Amendment immunity." Id. at 1233 (footnote omitted). "[E]ven after Hess and Doe, which emphasized the primacy of the impact on the state treasury as a factor in determining immunity, other factors remain relevant." Duke, 127 F.3d at 978. We therefore turn to the other factors delineated in our arm-of-the-state case law. Concluding that these other factors decisively resolve the question in favor of Eleventh Amendment immunity, we decline to address further the ambiguities attendant upon the question of legal liability for a judgment.

**B. Factors of Autonomy and Financial Independence**

- 12 -

Under the general rubrics of autonomy and financial independence, we have identified several other factors relevant to the arm-of-the-state determination:

> (1) the characterization of the governmental unit under state law; (2) the guidance and control exercised by the state over the governmental unit; (3) the degree of state funding received; and (4) the governmental unit's ability to issue bonds and levy taxes on its own behalf.

Sutton, 173 F.3d at 1232 (citing Mt. Healthy, 429 U.S. at 280); cf. Duke, 127 F.3d at 978 (setting forth a substantially similar list of factors derived from Hess, 513 U.S. at 44-46); Ambus, 995 F.2d at 994. We note that other circuits have considered additional factors in applying the Mt. Healthy test, including "whether the entity is concerned primarily with local as opposed to statewide problems." Hudson v. City of New Orleans, 174 F.3d 677, 681 (5th Cir.), cert. denied sub nom. Connick v. Hudson, 120 S. Ct. 498 (1999).

1. Characterization under State Law

The Board is not explicitly defined by state statute as either an arm of the state or a political subdivision. It is defined as a "body corporate." Colo. Rev. Stat. § 23-60-104(1)(b). Graham , 956 P.2d at 556, provides some guidance as to that term's meaning under Colorado law and its import in the context of our Eleventh Amendment analysis. In determining whether the University of Northern Colorado ("UNC") is a "person" for purposes of 42 U.S.C. § 1983, the Colorado Supreme Court concluded that UNC is an arm of the state under the Mt.

- 13 -

Healthy test. See id. at 562, 565-66. In reaching that conclusion, the court considered the status of UNC's board as a "body corporate," noting that such status is comparable to that of a municipality, but concluded that the general assembly's choice of corporate form did not evince an intent to waive sovereign immunity. See id. at 563. Rather, the court held that "such characterization appears to be for the purpose of providing a convenient means for allowing UNC to pursue the ends of higher education." Id. at 565; cf. Hamilton Mfg. Co. v. Trustees of State Colleges in Colo., 356 F.2d 599, 601 (10th Cir. 1966) (holding the Trustees are an arm of the state even though designated a body corporate). More to the point, the Colorado Court of Appeals has construed the relevant statutory provisions to conclude that the Board is an arm of the state traditionally immune from damages liability under the Eleventh Amendment and therefore not a "person" for purposes of liability under 42 U.S.C. § 1983. See National Camera, Inc. v. Sanchez, 832 P.2d 960, 963-64 (Colo. App. 1991). Although we are not bound by state court decisions regarding arm-of-the-state status, we defer to the rationale of National Camera insofar as it interprets state law. See Duke, 127 F.3d at 978.

By comparison, the school districts at issue in Ambus, 995 F.2d at 995 (quoting Utah Code Ann. § 63-30-2(7)), were explicitly characterized by Utah law as "political subdivision[s]." Ambus relied on this characterization, together with

the school districts' administrative autonomy and financial independence, to conclude the districts are not arms of the state. Our discussion in Ambus of financial factors took place in light of the central fact that the school boards at issue were explicitly classified by Utah law as political subdivisions. Conspicuously absent from those Colorado statutes that define a "political subdivision" is the Board. See, e.g., Colo. Rev. Stat. §§ 1-7.5-103(6) (defining "political subdivision to mean "a governing subdivision of the state, including counties, municipalities, school districts, and special districts" for purpose of Colorado election law), 8-70-103(23) (defining "political subdivision" as "a county, municipality, school district, local junior college district, special district formed pursuant to title 32, C.R.S., cooperative agency formed pursuant to part 2 of article 1 of title 29, C.R.S., or regional commission formed pursuant to section 30-28-105, C.R.S." for purposes of Colorado employment security law), 29-1-202(2) (defining "political subdivision" for purposes of Colo. Rev. Stat. §§ 29-1-201 to -206 ).

Sturdevant argues that Colo. Rev. Stat. § 24-4-102(3) excludes the Board from the definition of "state agency" for purposes of the State Administrative Procedure Act, by virtue of the fact that it is "administered pursuant to [Colo. Rev. Stat.] title 23." The Colorado Court of Appeals, however, has held that the Board "is by definition a state agency," National Camera, 832 P.2d at 963 (citing

- 15 -

Colo. Rev. Stat. § 24-4-102(3)), and we agree with the Colorado court's interpretation of state law. Even were Sturdevant correct, upon consideration of the entire Colorado statutory scheme, § 24-4-102(3) cannot reasonably be read as an expression of intent to classify the Board as a political subdivision. Rather, it would more reasonably be read as an indication that the powers and duties of the Board are to be governed by Colo. Rev. Stat. tit. 23 rather than the State Administrative Procedure Act, Colo. Rev. Stat. §§ 24-4-101 to -108, insofar as those statutory provisions differ. See Colo. Rev. Stat. § 24-4-102 (establishing definitions "as used in" Colo. Rev. Stat. tit. 24 art. 4, the "State Administrative Procedure Act"). Were we not to accept the reasoning of National Camera, we would reject the proposition that a state governing board of institutions of higher education cannot be an instrumentality of the state merely because it is not classified as a "state agency" for purposes of one legislative enactment.[2]

The Board is indisputably a kind of state-wide entity and absent from those provisions of Colorado law that define political subdivisions. See, e.g., Colo. Rev. Stat. § 1-7.5-103(6). We therefore conclude that the state law classification

---

[2] It matters little whether the Board itself is a "state institution of higher education" under Colo. Const. art. VIII, § 5. The community, technical, and junior colleges under its supervision are state institutions of higher education, cf. Colo. Rev. Stat. §§ 23-60-204, 23-71-127, and the Board is to be treated similarly to "the governing boards of institutions of higher education," Colo. Rev. Stat. § 23-60-202(1).

of the Board as analogous to "the governing boards of institutions of higher education," Colo. Rev. Stat. § 23-60-202(1), coupled with the holding of the Colorado Court of Appeals in National Camera, 832 P.2d at 963-64, weighs strongly in favor of the conclusion that the Board is an instrumentality of the State of Colorado.

2. State Control

The district court surveyed the governing statutory provisions and concluded that the Board "operates with a significant degree of autonomy." (Appellant's App. at 88). Appellant vigorously contests this characterization. Our review of the Colorado statutory provisions confirms that although the Board enjoys a significant degree of autonomy, the extent of state control over its operations is greater than the district court indicated. For example, while the Board has the authority to fix tuition and fees, see Colo. Rev. Stat. § 23-60-202(c), it can do so only "in accordance with the level of cash fund appropriations set by the general assembly for such institutions," id., and subject to review and approval by the CCHE, see id. §§ 23-1-105(2), -108(12).

Review of the case law suggests, in general, that despite the degree of supervision of the Board by the legislature and the CCHE, the district court is correct in concluding that the Board's degree of autonomy is similar in some respects to that exercised by many local school boards held to be political

subdivisions.  For example, the court in <u>Duke</u> found that although the New Mexico State Board sets general public school policies and standards, "[l]ocal school boards . . . have many other responsibilities and duties, which they perform without state control and supervision," including supervision of schools (subject to regulation), property acquisition and sale, bond issuance, and employment decisions.  <u>Duke,</u> 127 F.3d at 979.  The Board's authority to sue and be sued and its ability to own property are certainly indicia of autonomy analogous to those enjoyed by local school districts.

Nonetheless, these powers must be considered in light of the purpose, composition, and function of the state entity in question.  Sturdevant's arguments as to the degree to which the Board is free from direct state control by supervisory boards miss a fundamental point: The Board is itself the state's instrumentality of control over local and regional educational institutions.  We have previously noted that <u>Ambus</u> (in which we concluded local school boards were political subdivsions) "gave significant weight to the fact that local school boards, <u>which consist of members who are locally elected</u>, exercise responsibilities free from state control," <u>Sutton,</u> 173 F.3d at 1232 (citing <u>Ambus,</u> 995 F.2d at 996) (emphasis added), whereas in <u>Watson,</u> 75 F.3d at 575, in finding arm-of-the-state status, we "placed emphasis on the fact that the University was controlled by a sixteen-member board of regents, fifteen of whom were appointed

- 18 -

by the Governor," Sutton, 173 F.3d at 1233.   Here, the Board is far more closely analogous to the University of Utah's governing board of regents, being predominantly comprised of appointees of the state executive, see Colo. Rev. Stat. § 23-60-104(2)(a)(I), than it is to locally-elected school boards.   Indeed, the geographical diversity requirements of Colo. Rev. Stat. § 23-60-104(2)(a)(I) are indicative of the Board's status as a body of state-wide central administration rather than a political subdivision.   The relative lack of local involvement or even involvement by the member institutions in determining the makeup of the Board's voting members further buttresses that conclusion.   Cf. Sutton, 173 F.3d at 1232 (noting that, unlike local school districts, members of state school boards are members of the state board of education).[3]

In addition, although both local districts and the Board are subject to some mixture of autonomy and oversight by state executive or legislative bodies, the Board is explicitly focused on state-wide rather than local concerns:  The Board is "charged to develop and establish state policy for occupational education and to govern the state system of community colleges."  Colo. Rev. Stat. § 23-60-102(1)

---

[3] We have likewise consistently assumed that the state boards overseeing local school districts would be arms of the state.  See, e.g., Ambus, 995 F.2d at 995-96 (contrasting local school boards and the Utah State Board of Education). The Board's duties are remarkably similar to those of the Utah State Board of Education—general control and supervision of a state-wide school system composed of numerous local and regional institutions—as opposed to the local school boards we held to be political subdivisions.  See id.

(emphasis added); see also Hudson, 174 F.3d at 681 (including among the factors relevant to the arm-of-the-state analysis "[w]hether the entity is concerned primarily with local as opposed to statewide problems") (citing Clark v. Tarrant County, 798 F.2d 736, 744 (5th Cir. 1986)). Considering the genesis of the arm/subdivision distinction in Mt. Healthy, 429 U.S. at 280, we conclude that the district court gave insufficient weight to the Board's primary focus on state-wide issues, the governor's authority to appoint eleven of its thirteen members, and the degree to which its decisions are supervised by the CCHE and state legislature. Therefore, we conclude that considerations of autonomy and control weigh in favor of characterizing the Board as an arm of the state rather than as a political subdivision.

3. Degree of State Funding and the Ability to Issue Bonds and Levy Taxes

The third and fourth factors identified in Sutton concern "the degree of state funding received . . . and . . . the governmental unit's ability to issue bonds and levy taxes on its own behalf." 173 F.3d at 1232 (citing Ambus, 995 F.2d at 994). While these factors overlap somewhat with the question of "whether a judgment against the [defendant] would be paid out of the state treasury," id. at 1233 (citing Ambus, 995 F.2d at 996), as discussed above, uncertainty as to liability does not preclude consideration of other aspects of the financial

relationship between state and entity, see id. at 1233 & n.6, to provide guidance in applying our arm-of-the-state analysis.

### a. Sources of Funding

A discrete fund within the state treasury—one that does not revert to the legislature annually—falls under the control of the Board. See Colo. Rev. Stat. § 23-60-107(1). Powers of the Board include setting tuition and issuing bonds, but only within legislative guidelines and under the supervision of the CCHE. See id. § 23-60-202(1)(b) & (c). While it would appear that its financial affairs are dependent on legislative appropriations, the same may be said to be true, in varying degrees, as to many local school districts as well, lending some support to Sturdevant's argument for similarity between the Board and school districts. See, e.g., Ambus, 995 F.2d at 996-97 (discussing the receipt of state funding but holding that such funding does not render school districts arms of the state). Our review of the Colorado statues leads us to conclude, however, that a local school district's reliance in practice on state grants is qualitatively different, for purposes of the Mt. Healthy analysis, than the CCHE's direct supervision over the means by which the Board both raises and spends the moneys within its fund, whatever their source. Thus, factors relating to sources of funding weigh in on both sides of the arm-of-the-state/political subdivision scale.

### b. Ability to Issue Bonds and Levy Taxes

Although the Board has the power, with certain limits, to issue bonds, unlike a county, city, or even school district, it most certainly lacks the power to levy taxes. The absence of this characteristic attribute of political subdivisions is a relevant distinction in the case law. See, e.g., Mascheroni, 28 F.3d at 1559 (holding that the arm-of-the state inquiry includes "whether the state has empowered the entity to raise bonds and levy taxes") (citing Jackson v. Hayakawa, 682 F.2d 1344, 1350 (9th Cir. 1982)); see also Ambus, 995 F.2d at 996. We conclude, therefore, that the absence of taxing authority and the degree to which Colorado law provides that the Board's issuance of bonds and setting of fees are to be carried out in accordance with legislative appropriations, which themselves are influenced by a budget reviewed by the CCHE, see Colo. Rev. Stat. §§ 23-60-202(1)(c), 23-1-105(2), ultimately tip the balance more towards a finding of arm-of-the-state status than towards a finding of political subdivision status.

## C

Because of the open-ended nature of the arm-of-the-state analysis, it is easy to become caught up in the minutiae of state law, such as the extent of control over the Board by the executive and legislature, the details of the risk management fund's operation, and the proportional sources of the Board's funding. These details, however, must not eclipse a fundamental distinction that

emerges from Mt. Healthy and the cases following it—between alter egos or instrumentalities of states on the one hand, and political subdivisions such as cities and counties on the other.  Considering the various factors in context, the Board lacks a fundamental characteristic of a political subdivision—political control by some community other than the state as a whole.

Review of Tenth Circuit precedent in this area underscores the importance of this fundamental distinction.  We have consistently held that state colleges and universities are arms of the state, whereas local school boards are political subdivisions, even if largely dependent on state funding and subject to state control.  Kansas State University is an arm of the state, see Innes v. Kansas State University (In re Innes), 184 F.3d 1275, 1278 (10th Cir. 1999), cert. denied, 120 S. Ct. 1530 (2000); New Mexico municipal school boards are political subdivisions, see Duke, 127 F.3d at 981-82; the University of Texas is an arm of the state, see University of Texas at Austin v. Vratil, 96 F.3d 1337, 1340 (10th Cir. 1996); the University of Utah and its associated medical center are arms of the state, see Watson, 75 F.3d at 574-77; the Regents of the University of California constitute an arm of the state, see Mascheroni, 28 F.3d at 1559; Utah school districts are political subdivisions, see Ambus, 995 F.2d at 997; the University of Oklahoma is an arm of the state, see Seibert v. Oklahoma ex rel. University of Oklahoma Health & Sciences Center, 867 F.2d 591, 594 (10th Cir.

1989); the University of Colorado is an arm of the state, see Rozek v. Topolnicki, 865 F.2d 1154, 1158 (10th Cir. 1989); the New Mexico School of Mines is an arm of the state, see Korgich v. Regents of the New Mexico School of Mines, 582 F.2d 549, 551-52 (10th Cir. 1978); and the Trustees of the State Colleges in Colorado is an arm of the state, see Hamilton Manufacturing Co., 356 F.2d at 601. Sturdevant has identified no significant respect in which the relationship of the community colleges to the State of Colorado differs from the relationships of the universities in the above cases to their respective states; it would be anomalous to find the very instrumentality and intermediary of state control and funding to be somehow less of an alter ego of the state than the local and regional institutions it supervises on the state's behalf. Upon examination of the statutory scheme for the Board, we hold it to be an "instrumentality of the state," far more akin to state universities and their governing bodies than to a municipalities and local school boards. Therefore, the Board enjoys Eleventh Amendment immunity as an instrumentality or "arm" of the State of Colorado.

## IV

The judgment of the district court is **REVERSED** and this matter is **REMANDED** for further proceedings consistent with this opinion.