Jerry D. ORMSBY, Plaintiff,

v.

C.O.F. TRAINING SERVICES, INC., Defendant.

No. 01–4029–DES.

United States District Court, D. Kansas.

March 22, 2002.

Frank D. Taff, Topeka, KS, for Plaintiff.

Rodney K. Murrow, Lenexa, KS, for Defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Doc. 30). Plaintiff has filed a Response (Doc. 31), but defendant did not file a reply. In this action, brought pursuant to the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201, *et seq.*, and the Portal–to–Portal Pay Act of 1947 ("PPPA"), 29 U.S.C. § 251, *et seq.*, plaintiff alleges defendant willfully failed to pay him an appropriate measure of overtime. For the following reasons, defendant's motion shall be granted.

## I. BACKGROUND

The following facts concerning plaintiff's claims are either uncontroverted or, if controverted, are construed in a light most favorable to plaintiff.

Defendant, a Kansas nonprofit corporation, operates "Hunter House," a residential group home for the developmentally disabled in Osage City, Kansas. Plaintiff was employed by defendant from 1994 until February 19, 2001. As Hunter House's manager, plaintiff was required to work a rather unorthodox schedule. During the time relevant to this action, plaintiff was on-duty for approximately eight hours per day Monday through Friday, and plaintiff received compensation for a standard forty-hour work week. In addition to his regular hours, however, plaintiff was required to be physically present at the facility from approximately 10:00 p.m. until 5:30 a.m. Monday through Thursday. According to defendant, during this "sleep time," plaintiff was not to perform his routine duties. It is uncontroverted, however, that while not technically "working," plaintiff was not free to leave Hunter House. This action is solely concerned with whether plaintiff was legally compensated for this time.

Pursuant to the FLSA and PPPA, plaintiff alleges defendant willfully failed to pay him for the overtime he accumulated on account of his mandatory overnight presence at Hunter House. Plaintiff seeks overtime compensation, liquidated damages, and an award of costs and attorney's fees. Defendant seeks summary judgment claiming: (1) the court lacks subject matter jurisdiction due to defendant's immunity from suit pursuant to the Eleventh Amendment of the United States Constitu-

tion; and (2) defendant correctly deducted plaintiff's sleep hours.

## II. STANDARD OF REVIEW

Summary judgment[1] is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The rule provides that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law identifies which facts are material. *Id.* at 248, 106 S.Ct. 2505. A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the nonmovant. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant has the initial burden of showing the absence of a genuine issue of material fact. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). The movant may discharge its burden "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. 2548. Once the movant makes a properly supported motion, the nonmovant must do more than merely show there is some metaphysical doubt as to the materi-

---

1. Although characterized as an alternative motion, defendant and plaintiff both present their arguments to the court within the summary judgment framework. Having no justi-

fication to interpret the motion as anything but a motion for summary judgment, the court proceeds with its analysis.

al facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (interpreting Fed. R.Civ.P. 56(e)). Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Id.* at 322, 106 S.Ct. 2548. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. 2548.

A court must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence. *See, e.g., United States v. O'Block,* 788 F.2d 1433, 1435 (10th Cir.1986) ("The court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues."). The court's function is not to weigh the evidence, but merely to determine whether there is sufficient evidence favoring the nonmovant for a finder of fact to return a verdict in that party's favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Id.* at 250, 106 S.Ct. 2505.

## III. DISCUSSION

### A. Eleventh Amendment Immunity

■ The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although not contained within the Amendment's text, it is well established that a state's immunity also encompasses suits brought by its own citizens. *Meade v. Grubbs,* 841 F.2d 1512, 1525 (10th Cir.1988). In *Aaron v. Kansas,* 115 F.3d 813 (10th Cir.1997), the Tenth Circuit held Congress did not properly abrogate a state's immunity in regards to wage and overtime claims brought pursuant to the FLSA. *See also Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (recounting the history of state sovereignty and the impact of the Constitution and the Eleventh Amendment on that sovereignty). Therefore, this court lacks subject matter jurisdiction, pursuant to the Eleventh Amendment, over FLSA damage claims brought against a state.

### 1. Arm–of–the–State

■ In the case at bar, defendant alleges it is entitled to share in the State of Kansas's immunity pursuant to the "arm-of-the-state" doctrine. The doctrine stands for the proposition that Eleventh Amendment immunity extends not only to states but also to those "entities created by state governments that operate as alter egos or instrumentalities of the states." *Sturdevant v. Paulsen,* 218 F.3d 1160, 1164 (10th Cir.2000). *See also Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1233 (10th Cir.1999) (granting state school arm-of-the-state status); *Watson v. University of Utah Med. Ctr.,* 75 F.3d 569, 574 (10th Cir.1996) (granting university medical center arm-of-the-state status); *Mascheroni v. Board of Regents of the Univ. of California,* 28 F.3d 1554, 1559 (10th Cir.1994) (granting state university arm-of-the-state status). However, the state's immunity does not cover political subdivisions of the state, such as counties, municipalities, or local school districts. *Lake Country Estates, Inc. v. Tahoe Reg'l*

*Planning Agency,* 440 U.S. 391, 401, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979); *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *See also Elam Constr., Inc. v. Regional Transp. Dist.,* 129 F.3d 1343, 1346 (10th Cir.1997) (finding transportation district was a political subdivision so denying it arm-of-the-state status); *Ambus v. Granite Bd. of Educ.,* 995 F.2d 992, 994 (10th Cir.1993) (denying school district arm-of-the-state status).

 Whether a particular entity is entitled to arm-of-the-state status is ultimately a question of federal law, yet the court must consider each entity separately in accordance with the particular state laws characterizing the entity. *See Duke v. Grady Mun. Schs.,* 127 F.3d 972, 975–78 (10th Cir.1997). The Supreme Court defined the bounds of this inquiry as follows:

> The issue here thus turns on whether the [entity] is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend. The answer depends, at least in part, on the nature of the entity created by state law.

*Mount Healthy,* 429 U.S. at 280, 97 S.Ct. 568.

In *Watson,* the Tenth Circuit built upon the *Mount Healthy* test. According to the Tenth Circuit, the arm-of-the-state inquiry is comprised of

> two general inquiries. The court first examines the degree of autonomy given to the agency, as determined by the characterization of the agency by state law and the extent of guidance and control exercised by the state. Second, the court examines the extent of financing the agency receives independent of the state treasury and its ability to provide for its own financing. The governmen-

tal entity is immune from suit if the money judgment sought is to be satisfied out of the state treasury.

*Watson,* 75 F.3d at 574–75 (internal citation and quotation marks omitted).

 In a recent arm-of-the-state analysis, the Tenth Circuit tweaked and expanded the two-prong inquiry under *Watson* by reorganizing the critical elements of *Mount Healthy* into a multi-tiered examination. *Sturdevant,* 218 F.3d at 1165–69. Under *Sturdevant,* the court begins by considering: (1) whether the entity is legally liable for the anticipated judgment; and (2) whether the entity is an autonomous creation. *Id.* Within the autonomy element, the court will examine: (1) the entity's characterization under state law; (2) state control over the entity; and (3) the entity's degree of state funding and its ability to issue bonds and levy taxes. *Id.*

### 2. General Description of Defendant

Before addressing the individual factors listed above, the court finds it necessary to lay out a general overview of defendant and its role within the state's social services system. Under the Developmental Disabilities Reform Act ("Act"), Kansas Statutes Annotated § 39–1801 *et seq.,* Kansas has established a state policy of assisting individuals with developmental disabilities in attaining access to community based services. Kan. Stat. Ann. § 39–1802. Central to the Act is the establishment of Community Developmental Disability Organizations ("CDDO").

A CDDO's primary responsibility is to "serve as a single point of application or referral for services, and assist all persons with a developmental disability to have access to and an opportunity to participate in community services ...." *Id.* § 39–1805(a). The CDDOs are spread throughout the state and operate within either a single county or a group of counties. The

CDDOs accomplish their goal by coordinating with, and entering into affiliations with, Community Service Providers ("CSP"). As their name implies, the CSPs actually provide the developmentally disabled with services and programs designed to meet their developmental needs. All CSPs must be licensed by the Kansas Department of Social and Rehabilitation Services ("SRS"). Kan. Admin. Reg. § 30–63–10. A CDDO, in addition to being the organizing entity for its region, may also directly provide services, as a CSP, to the developmentally disabled. Kan. Stat. Ann. § 39–1803(e). According to the affidavit presented to the court, defendant appears to be both a CDDO and a licensed CSP. (Andrews Aff. ¶ 6).

Defendant serves as the CDDO for Coffey, Osage, and Franklin Counties.[2] Defendant maintains this title through its yearly contract with SRS. The court will further explore defendant's connection with the state and its operation below.

### 3. Application of *Sturdevant* Factors

#### a. Legal Liability for a Judgment

Defendant's status as an arm-of-the-state heavily depends on whether the Kansas treasury will bear liability for the judgment sought in this case. *See Regents of the Univ. of California v. Doe,* 519 U.S. 425, 430, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997) (noting the most important factor is whether a judgment against the entity would be paid from the state treasury); *Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30, 48, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994) (same); *Duke,* 127 F.3d at 981 (holding state treasury liability strongly favors arm-of-the-state status).

In the present case, defendant argues that although it would satisfy any judgment with money from its "reserve fund," this cost has the *"potential* to impact on the state treasury." (Def. Mem. at 14) (emphasis added). Defendant first directs the court's attention to the funding provisions of the Act. In particular, the Act dictates that SRS shall establish

> [a] system of adequate and reasonable funding or reimbursement for the delivery of community services that:
>
> . . . .
>
> (3) requires an independent, professional review of the rate structures on a biennial basis resulting in a recommendation to the legislature regarding rate adjustments. Such recommendation shall be adequate to support: ... (D) risk management and insurance costs
>
> . . . .

Kan. Stat. Ann. § 39–1806(a)(3).

According to defendant, any judgment rendered in this case would necessarily have to be reported to SRS and "could affect the 'rate adjustment' referred to in the statute." (Def. Mem. at 14). The court is left perplexed by this assertion, and defendant, unfortunately, offers no elaboration on the issue. Contrary to the court's first impression, defendant does not appear to be arguing that a judgment would be satisfied by payment from the state's risk management fund. *Cf. Sturdevant,* 218 F.3d at 1165 (noting that the defendant-entity claimed a judgment against it would be paid out of Colorado's risk management fund). Instead, defendant appears to only be asserting that SRS will be made aware of the judgment, so impacting future disbursements by the state legislature. As explained by defendant, and uncontroverted by plaintiff, a vast majority of defendant's operating budget is derived from the state treasury, which is funneled to defendant via SRS and its contract with defendant. Defendant argues, therefore, that to ensure SRS and the state meet the stated policies of the Act, the state will necessarily have to

---

2. Defendant's corporate name, C.O.F., is an acronym for defendant's three county region.

increase funding to cover the funds expended on the judgment.

■ At best, defendant is only able to demonstrate a tangential or indirect effect on the state's treasury. In *Sturdevant*, however, the Tenth Circuit reemphasized that within this consideration, the court must "focus on the legal incidence, not the practical effect, of the liability." 218 F.3d at 1165 (citing *Duke*, 127 F.3d at 981). What is critical is the state's legal *liability* for the judgment as compared to the state's *ability* to fund existing or proposed programs. *See generally Doe*, 519 U.S. at 430–31, 117 S.Ct. 900. Given defendant's concession that it, instead of the state, is legally responsible for payment, the court must find that this factor weighs against granting defendant arm-of-the-state status.[3]

### b. Characterization Under State Law

Generally, the starting point for this analysis is an examination of the state law, which created the entity under scrutiny. *See, e.g., Watson*, 75 F.3d at 575 (discussing Utah statute creating and defining duties of the State Board of Regents). This focus on legislative creation is justified, for as discussed earlier, the state-of-the-arm doctrine is routinely used in deciding whether entities *created* by state law may share in the state's immunity. *See Mount Healthy*, 429 U.S. at 280, 97 S.Ct. 568 ("The answer depends, at least in part, on the nature of the entity *created* by state law.") (emphasis added); *Sturdevant*, 218 F.3d at 1164 ("entities *created* by state governments that operate as alter egos or instrumentalities of the states") (internal citation and quotation marks omitted) (emphasis added). In addition, courts normally look to state law to determine if the state legislature has characterized the entity as either an arm-of-the-state or a political subdivision. *See, e.g., Sturdevant*, 218 F.3d at 1167 ("The Board is not explicitly defined by state statute as either an arm of the state or a political subdivision.").

The case at bar presents an unique situation, for, as a corporate entity engaged in a contractual relationship with the state, defendant was not created by direct legislative action. Apparently cognizant of its unorthodox position, defendant directs the court's attention solely to those provisions of the Act, which specifically detail how SRS will, in conjunction with the CDDOs, meet the state's enumerated policies. Kan. Stat. Ann. § 39–1804(a). Defendant asserts that, even though it is a private contractor, it is carrying out the state's policy on behalf of the state, so it is acting as the state's "alter ego."

While presenting a novel argument, the court rejects defendant's position. Turning to the Act, the statute defines a CDDO as "any community mental retardation facility that is organized pursuant to [Kansas Statutes Annotated §§ ] 19–4001 through 19–4015 and amendments thereto." Kan. Stat. Ann. § 39–1803(d).[4] Reading Kansas

---

**3.** The court rejects defendant's assertion that *Sturdevant* requires a different conclusion. Contrary to defendant's position, the Tenth Circuit did not grant arm-of-the-state status to the defendant-entity even though payment of the judgment would only have had an indirect impact on the state's treasury. Instead, due to ambiguities in the record, the circuit court opted to forgo rendering a conclusion on the legal liability analysis and rested its decision on the remaining factors. *Sturdevant*, 218 F.3d at 1166.

While certainly some ambiguity exists in this case, the present defendant, as distinguished from *Sturdevant*, admits legal liability for any judgment rests directly upon its shoulders.

**4.** According to SRS regulations, at the time the Act became effective, each entity previously known as a community mental retardation center was to be now recognized as a CDDO. Kan. Admin. Reg. § 30–64–10. The newly titled CDDOs were to have the same service

Statutes Annotated § 19–4001 *et seq.*, reveals a system by which individual counties, or counties acting in concert, can provide services to their mentally disabled citizens. In particular, the statutes provide that a county may itself establish a community facility for the mentally retarded, Kan. Stat. Ann. § 19–4001, or, if it should be determined to be more practicable, contract with a nonprofit corporation for the providing of such services. *Id.* § 19–4007(a). Under this legislation, the corporations contracted directly with a county's board of commissioners or with a mental retardation governing board established by the board of commissioners. *Id.* The corporations were, however, required to be approved by SRS, and the corporations were directed to make annual reports to SRS. *Id.* A board of commissioners or a governing board was authorized to levy an annual tax for the funding of mental health services within their respective counties. *Id.* § 19–4004. The court is convinced that community mental retardation facilities established pursuant to § 19–4001 *et seq.* were primarily created, overseen, and funded by the respective counties the facilities served.

With the enactment of the Act in 1995, the Kansas legislature was surely modifying the existing system. In particular, through the Act, the facilities, now termed CDDOs, were burdened with the additional administrative role as coordinators of all community services rendered within their region. *Id.* § 39–1805(a). SRS was also required to establish a statewide system of funding the CDDOs. *Id.* § 39–1806. However, the state did not remove the local control exercised by individual coun-

ties. Specifically, according to SRS regulations, any entity attempting to become a new CDDO or attempting to alter an existing CDDO's region, must first demonstrate compliance with Kansas Statutes Annotated § 19–4001 *et seq.* The relevant regulation states:

> Anyone proposing the establishment of a new CDDO, or the realignment of the service area of any existing CDDO, shall apply for approval of the proposal to the commissioner in writing. The application shall include the following:
>
> . . . .
>
> (2) a copy of the establishing resolution or resolutions adopted pursuant to [Kansas Statutes Annotated § ] 19–4001, and amendments thereto, by the affected board or boards of county commissioners.

Kan. Admin. Reg. § 30–64–12.

In addition, funding received by the CDDOs pursuant to their contracts with SRS did not completely replace funding received from the county levy. Kan. Admin. Reg. § 30–64–33(b) ("A contracting CDDO shall not use funds received through this contract to supplant funds previously received from local tax levies made pursuant to [Kansas Statutes Annotated § ] 19–4004, and amendments thereto.").

Without question, under the Act, CDDOs now contract directly with the state, receive the majority of their funding from the state, and perform some of their duties pursuant to state policy. On the other hand, as mentioned above, the CDDOs have not completely abandoned their county/local roots.[5] In fact, it appears from the court's reading of the

---

area as they did under the prior legislation. *Id.*

**5.** Defendant argues in its papers to the court that "[t]he services provided by [defendant] were provided directly by the State of Kansas

prior to the passage of the [Act]. [Defendant] is, literally, doing the state's work." (Def. Mem. at 18). In light of the state law discussed above, the court has serious doubts regarding the accuracy of defendant's assertion.

statutes, that the board of directors or governing board of any CDDO, including defendant, is still comprised of county representatives. Kan. Stat. Ann. § 19–4002(a)(1).

The true nature of defendant under state law is ambiguous at best. However, the court is able to discern several factors, which weigh against defendant's position. First, defendant's association with the State of Kansas rests solely on its contractual relationship with the state. In other words, state law did not create defendant, but, rather, the statutes merely provide an avenue by which the state can "purchase" services from entities similar to defendant. Second, defendant's realm of influence and service is strictly limited to its geographical boundaries. By no means is defendant a state-wide entity carrying out state-wide policy. *Cf. Sturdevant,* 218 F.3d at 1168 (finding the defendant-entity was a "state-wide entity"). Finally, while seemingly conscripted by the state under the Act, the CDDOs were originally the product of local initiatives. As the above discussion reveals, this local character was not completely supplanted by the Act.

Defendant failed to produce a single authority wherein a corporation providing contractual services was granted arm-of-the-state status. The court's own research, however, revealed the case of *Citrano v. Allen Corr. Ctr.,* 891 F.Supp. 312 (W.D.La.1995). In *Citrano,* the district court was faced with a private contractor, Wackenhut Corp., operating a correctional facility pursuant to state law authorizing such private management. *Id.* at 320–21. After a rather abbreviated analysis, the district court granted Wackenhut arm-of-the-state status. *Id.* at 321. While reflecting some similarity to the present case, the court finds *Citrano* to be unpersuasive. First, unlike the present defendant, Wackenhut operated correctional institutions throughout the state. *Id.* at 320. While the state law in the present case does invoke state-wide policy concerns, defendant's role in achieving these policies is purely local. Second, while not relevant to the instant analysis, the district court in *Citrano* employed a Fifth Circuit endorsed *Mount Healthy* test devoid of any concern for the liability of the putative judgment. *Id.* (listing relevant factors for consideration but not mentioning legal liability for the judgment). Considering the weight the Tenth Circuit has placed on this factor, the court finds the *Citrano* opinion easily distinguishable. *See generally Teichgraeber v. Memorial Union Corp.,* 946 F.Supp. 900, 905 (D.Kan.1996) (denying corporate contractor arm-of-the-state status because there was no basis for finding the judgment would be satisfied by the state's treasury); *Mullin v. P & R Educ. Servs., Inc.,* 942 F.Supp. 110, 114 (E.D.N.Y.1996) (same).[6]

---

6. Two courts in this district have considered the liability of entities engaged in similar functions as compared to the present defendant. *See Smith v. Board of County Comm'rs,* 96 F.Supp.2d 1177 (D.Kan.2000) (Vratil, J.); *Dow v. Terramara, Inc.,* 835 F.Supp. 1299 (D.Kan.1993) (Kelly, J.).

In *Smith,* the court was considering the liability of a "community based agency which arranges and provides services for individuals with mental retardation and other developmental disabilities" within the context of an employment discrimination case. 96 F.Supp.2d at 1182. Although the defendant was clearly covered by the Act, Eleventh Amendment immunity was not at issue. *Id.* at 1184 (discussing Developmental Disability Reform Act).

In *Dow,* the court was faced with a "private, nonprofit 501(c) corporation, ... [which] provides a work activity center, housing, and other services for adult, mentally handicapped persons in Butler, Greenwood, and Elk counties." 835 F.Supp. at 1299. The plaintiff had filed suit pursuant to 42 U.S.C. § 1983. *Id.* at 1300. At issue was whether the defendant acted "under color of state law" for purposes of § 1983. *Id.* at

In sum, while presenting a close call, the court finds defendant's characterization under state law weighs against granting defendant arm-of-the-state status.[7]

#### c. State Control

As to be expected, defendant argues the state has a substantial measure of control over its operations. Defendant once again directs the court to those provisions of the Act, which outline the duties and powers of the CDDOs. Kan. Stat. Ann. § 39–1805. Additionally, according to defendant, "like pure state agencies, [defendant] is subject to budgetary constraints of the legislature and a funding review process .... In nearly all respects, the [Act] closely resembles the creation of a state agency to carry out state policy." (Def. Mem. at 19).

Without question, defendant operates in a highly regulated arena. The Act and its implementing regulations certainly create a degree of state oversight. However, the court rejects defendant's assertion that such oversight is tantamount to the creation of a state agency. First, defendant has not demonstrated any state control over its actual day-to-day operations. *See Elam Const., Inc. v. Regional Transp. Dist.*, 129 F.3d 1343, 1346 (10th Cir.1997)

(denying defendant-entity arm-of-the-state status, in part, because state exercised very little oversight over its day-to-day operations). While the state, through SRS, may license CSPs, inspect the facilities operated by CDDOs and CSPs, and mandate certain issues regarding staffing, *see* Kan. Admin. Reg. §§ 30–63–13, 30–63–14, 30–63–26, SRS does not maintain, through state officials, any presence within defendant's corporate operations. *Cf. Sturdevant*, 218 F.3d at 1168–69 (defendant-entity's board was comprised of appointees of the state executive); *Watson*, 75 F.3d at 575 (same). Absent such direct control, the court interprets the Act's provisions as a mere recitation of the CDDOs' obligations under their respective contracts.

Second, as discussed above, defendant is not a state-wide actor. *Cf. Sturdevant*, 218 F.3d at 1169 (finding lack of local involvement indicative of a state-wide entity entitled to arm-of-the-state status). The court is unable to accept defendant's "state agency" analogy when its sphere of influence is strictly limited to three counties. As a CDDO, defendant is only responsible for overseeing the distribution of community services within its region.

1300–03. In the end, Judge Kelly found the defendant was not a state actor. *Id.* at 1303.

While the entities under scrutiny in both cases are strikingly similar to the present defendant, the court finds the opinions to be of little assistance. First, in *Smith*, the parties clearly considered the entity to be a county "agency" and never argued for immunity. The court speculates this strategy was taken because of a specific state law allowing the board of commissioners of Johnson county to serve as the community mental health governing board for the county. Kan. Stat. Ann. § 19–4002b. Second, in *Dow*, the court was not considering immunity, but, rather, the related but still distinct issue of state action under § 1983. In addition, *Dow* was decided before the enactment of the Act. For these reasons, the court has not considered *Smith* and *Dow* within its determination.

**7.** In reaching this conclusion, the court has rejected defendant's assertion that because plaintiff allegedly participated in Kansas' Public Employees Retirement System ("KPERS"), defendant must necessarily be an arm-of-the-state. As defined by KPERS, an "eligible employer" means "the state of Kansas, and any county, city, township, special district or any instrumentality of any one or several of the aforementioned ...." Kan. Stat. Ann. § 74–4902(13). As the statute makes clear, employees of political subdivisions, which are clearly not entitled to arm-of-the-state status, may also participate in KPERS. Hence, merely alleging plaintiff's participation does not dictate, standing alone, any finding regarding defendant's character for Eleventh Amendment immunity.

Similarly, local school districts are charged with the supervision of students within their geographical regions. In contrast, state school boards generally oversee the state-wide implementation of educational policies. This dichotomy between state-wide versus local is critical in determining which entities are afforded immunity. *See id.* at 1169 n. 3 (noting distinctions between local and state-wide school boards and their differing classification for purposes of arm-of-the-state analysis).

For these reasons, the court finds this factor weighs against granting defendant arm-of-the-state status.

### d. State Funding

According to defendant, it receives eighty percent of its annual funding from the state. These funds are routed to defendant via defendant's contract with SRS. SRS mandates monies paid pursuant to a CDDO's contract may only be spent in furtherance of the contract. Kan. Admin. Reg. § 30–64–33. The funds are also subject to audit and review by SRS. *Id.* While simple receipt of state monies does not necessarily weigh in favor of arm-of-the-state status, the receipt of state money in conjunction with control over how it is spent does weigh in defendant's favor. *Compare Ambus,* 995 F.2d at 996–97 (discussing the receipt of state funding but holding that such funding does not render local school districts arms-of-the-state), *with Sturdevant,* 218 F.3d at 1169–70 (stating receipt of money plus state control may weigh in favor of granting status). Therefore, this factor appears to weigh in favor of granting defendant arm-of-the-state status.

The court finds the issue of whether or not defendant can levy taxes or issue bonds inapplicable in this case. Without question, defendant is incapable of pursuing its own public funding, yet, unlike in a more traditional scenario, this inability fails to tip the scales in either direction.

### 4. Eleventh Amendment Conclusion

After an extensive consideration of all the *Sturdevant* factors, the court is convinced defendant does not qualify for arm-of-the-state status. As a corporate contractor, defendant is simply not closely enough aligned with the State of Kansas to share in its Eleventh Amendment immunity. The court's conclusion rests first and foremost on defendant's own admission regarding the absence of any state liability for the judgment in this case.

### B. Substantive FLSA Argument

As a second ground for summary judgment, defendant contends it is entitled to judgment as a matter of law on plaintiff's FLSA claim. It is uncontested defendant was not exempt from the FLSA and that plaintiff was a salaried "nonexempt" worker. (Pretrial Order ¶ 4.4). As a general principle, the FLSA requires employers to pay their workers time and a half for overtime. 29 U.S.C. § 207(a)(1). Overtime is considered any hours worked in excess of forty hours within a single workweek. *Id.*

The issue of sleep time and its implications within the FLSA's overtime mandate have been thoroughly litigated in the Tenth Circuit. *See, e.g., Braziel v. Tobosa Dev. Servs.,* 166 F.3d 1061 (10th Cir.1999); *Brown v. City of Oklahoma City,* 45 F.3d 439 (10th Cir.1994) (table); *Blackburn v. Kansas Elks Training Ctr. for the Handicapped, Inc.,* 40 F.Supp.2d 1270 (D.Kan. 1999); *Bayles v. American Med. Response of Colorado, Inc.,* 937 F.Supp. 1477 (D.Colo.1996). More importantly, in *Braziel* and *Blackburn,* the courts were considering the issue of sleep time within the context of residential care facilities. Applying the teachings of *Braziel* to the facts

of this case reveals defendant is entitled to judgment.

As the Tenth Circuit stated: "Regulations promulgated pursuant to the FLSA provide that, absent an express or implied agreement to the contrary, sleep time and meal periods constitute hours worked." *Braziel,* 166 F.3d at 1063. The regulations referenced by the circuit court are 29 C.F.R. §§ 785.22, 785.23. In particular, the regulations provide:

> An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. It is, of course, difficult to determine the exact hours worked under these circumstances and *any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted.*

29 C.F.R. § 785.23 (emphasis added). *See also id.* § 785.22 (providing that where employees are on duty for twenty-four hours or more, the employee and employer may agree to exclude up to eight hours of sleep time from the employee's working hours). Therefore, regardless if the employee is scheduled for twenty-four hour shifts or not, the central question "is whether an agreement existed between [the employer] and [employee] to exempt scheduled sleep periods from hours worked." *Braziel,* 166 F.3d at 1063. *See also Skidmore v. Swift & Co.,* 323 U.S. 134, 137, 65 S.Ct. 161, 89 L.Ed. 124 (1944) ("The law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was.").

In the present case, defendant contends plaintiff agreed to work his schedule, fully appreciating the sleep time exclusion. On the other hand, plaintiff argues no agreement existed. It is uncontroverted that no express agreement was entered into by the parties, but, as defendant asserts, the court may find the parties entered into an implied agreement. After reviewing plaintiff's deposition testimony, the court is convinced plaintiff fully understood the nature and ramifications of his schedule and salary. *Braziel,* 166 F.3d at 1063 (finding an implied agreement when the employee understood and acquiesced to the policy excluding sleep time). In fact, it appears plaintiff not only acquiesced to the schedule but actually lobbied for its implementation. According to plaintiff's testimony, as a member of a committee within defendant's operation, plaintiff traveled to another CDDO facility in Kansas to investigate how it scheduled its residential care employees. (Pl. Dep. at 43–44). After its investigation was complete, it was the conclusion of the committee that defendant adopt the schedule in question. (*Id.*). Furthermore, plaintiff concedes he agreed to the schedule and the sleep time exclusion. (*Id.* at 77). Although defendant contends he always "disagreed" with the sleep time exclusion, the record is clear he understood its ramifications and acquiesced to its application. *Braziel,* 166 F.3d at 1062 (finding implied agreement even though employees later "complained" about the sleep exclusion).[8]

Plaintiff's only argument that an implied agreement did not exist relies on defendant's employee handbook. In particular, plaintiff directs the court's attention to

---

8. Plaintiff does not contend the agreement was unreasonable. *See* 29 C.F.R. § 785.23 (requiring agreements to be "reasonable").

those sections of the handbook, which notify the employee that his or her employment is to be considered "at-will." (Pl. Resp., App. at 2). According to plaintiff: "The goal of defendant was at all times relevant to avoid any implied contractual relationship with its employees. It would be manifestly unjust to allow it to claim the safe harbor of an implied agreement regarding the unpaid overtime compensation claimed by [plaintiff]." (Pl. Mem. at 31). The court rejects plaintiff's position. Plaintiff has provided the court with no support for the proposition that an at-will employee cannot enter into implied agreements, which do not touch upon the employee's classification for purposes of termination. Under plaintiff's position, no at-will employee could ever enter into agreements envisioned by the FLSA's implementing regulations. The court finds it wholly reasonable that an at-will employee could, and in this case did, enter into an implied agreement without altering the mutually held expectations regarding his termination.

The court concurs with plaintiff's general assertion that, under Kansas law, ordinarily the existence or nonexistence of an implied agreement is an issue of fact best reserved for the jury. In this case, however, the record before the court fails to present any facts, which demonstrate a triable issue. Under these circumstances and in line with *Braziel*, the court is persuaded defendant has met its summary judgment burden, so judgment will be granted it its favor.

## C. Good-faith Defense

In the alternative, defendant argues even if it violated the FLSA, it is entitled to judgment pursuant to the good-faith defense embodied in 29 U.S.C. § 259. Under the PPPA, a defendant-employer is granted the following affirmative defense:

In any action or proceeding based on any act or omission, ... no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the [FLSA], if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States ....

29 U.S.C. § 259 (listing the Administrator of the Wage and Hour Division of the Department of Labor as the referenced "agency of the United States").

 To be entitled to the defense, an employer must plead and prove that the act or omission complained of was: (1) done in good faith; (2) in conformity with; and (3) in reliance on a written administrative regulation, order, ruling, approval or interpretation of the Wage and Hour Division. *See Olson v. Superior Pontiac–GMC, Inc.*, 765 F.2d 1570, 1579 (11th Cir. 1985).

To this end, defendant has attached to its filing what it titles "Wage and Hour Memorandum 88.48." (Def.Mem., Ex. 10). According to defendant, this "memorandum," drafted by the Administrator of the Wage and Hour Division, specifically dictates what hours are properly excludable as sleep time within a residential care facility. While generally on the mark, defendant has somewhat misconstrued the nature of this document. While the cover page is entitled "memorandum," the actual document at issue is the attached "Enforcement Policy," promulgated on June 30, 1988. Hours Worked in Residential Care (Group Home) Establishments— Sleep Time and Related Issues—Enforcement Policy ("1988 Policy"), 1988 WL 614199, Dep't of Labor, Wage and Hour Div. (June 30, 1988). *See* 29 C.F.R. § 790.18(a) ("The terms 'administrative

practice or enforcement policy' refer to courses of conduct or policies which an agency has determined to follow in the administration and enforcement of a statute, either generally, or with respect to specific classes of situations."). *See also Bouchard v. Regional Governing Bd. of Region V Mental Retardation Servs.*, 939 F.2d 1323, 1328 (8th Cir.1991) (discussing the history behind the creation of the 1988 Policy).[9]

The 1988 Policy was intended to clarify the Wage and Hour Division's application of the sleep time regulations as applied to residential care employees. *See* 1988 Policy, 1988 WL 614199 at 1 ("The following enforcement policy statement is intended to assist employers and employees by restating and clarifying the position of the Wage and Hour Division with respect to certain sleep time and other hours worked."). In particular, the 1988 Policy concerns application of the sleep time regulation embodied in 29 C.F.R. § 785.23. Pursuant to the 1988 Policy, an employee's sleep time is excludable only if the employee is first deemed to reside on his employer's premises for an "extended period of time." To this end, the 1988 Policy establishes that an employee resides on his employer's premises if:

(1) the employee is on duty at the group home and is compensated for at least eight hours in each of five consecutive 24–hour periods; and

(2) the employee sleeps on the premises for all sleep periods between the beginning and end of this 120–hour period.

1988 Policy, 1988 WL 614199 at 3.

According to the affidavits of defendant's management personnel, defendant's schedule met this preliminary standard. (Andrews Aff. ¶ 23; Curtis Aff. ¶ 3). On

the other hand, plaintiff argues his schedule failed both elements, and "[a] review of his schedule contained in his answer to interrogatory no. 5 served by defendant and his affidavit attached will dispel that notion." (Pl. Mem. at 34).

After reviewing both plaintiff's affidavit and his interrogatory answer, the court concludes plaintiff has misinterpreted the 1988 Policy. According to plaintiff, he "was not on duty for five consecutive nights at Hunter House; nor did he sleep on the premises for all "sleep periods" between the beginning and end of any 120–hour period; nor was he on the premises continuously for 120 hours per week." (Pl.Aff.¶ 33). As interpreted by the court, plaintiff argues that because he only slept at Hunter House Monday through Thursday, he did not "sleep on the premises for all sleep periods between the beginning and the end of this 120–hour period." 1988 Policy, 1988 WL 614199 at 3. However, this assertion misses the point, for the relevant 120–hour period ended when plaintiff's shift concluded on Friday afternoon. In other words, to meet the sleeping-on-site requirement, plaintiff need only have slept four nights at the facility not five. The validity of this conclusion is evidenced by an example given within the 1988 Policy itself:

an employee who is on duty and is compensated from 6:00 a.m. to 9:00 a.m. and 5:00 p.m. to 10:00 p.m., Monday through Friday, and who *sleeps Monday through Thursday nights on the premises*, would be considered to reside on the premises for extended periods of time.

*Id.* (emphasis added). The court finds, therefore, that plaintiff's schedule qualified him under the 1988 Policy.

---

9. Plaintiff argues the court should not consider the 1988 Policy because it is inadmissible as unauthenticated hearsay. The court summarily rejects plaintiff's position.

The 1988 Policy goes on to list several criteria, which must be met for the employer to deduct sleep time from an employee's work hours:

(1) the employer and the employee have reached an agreement in advance that sleep time is being deducted;

(2) adequate sleeping facilities with private quarters were furnished;

(3) if interruptions occurred, employees in fact got at least five hours of sleep during the scheduled sleeping period;

(4) employees are in fact compensated for any interruptions in sleep; and

(5) no more than eight hours of sleep time is deducted for each full 24-hour on-duty period.

*Id.* Defendant argues all five criteria were satisfied. Although plaintiff makes no specific arguments to the contrary, the court will briefly consider each criteria.

As to the first criteria, the court has already found an implied agreement existed between plaintiff and defendant. As to the second criteria, plaintiff testified his sleeping quarters consisted of two rooms, which were separated from the rest of Hunter House by locking doors. (Pl. Dep. at 35–38). Inside the rooms, plaintiff had a bed, dresser, television, chair, couch, closet, and a private bathroom. (*Id.*). In addition, plaintiff, as well as plaintiff's spouse, kept personal possessions and toiletries within his sleeping quarters. (*Id.*). Without question, plaintiff was supplied with sufficient private space. As to the third criteria, no evidence is before the court, which suggests any significant interruptions occurred. While plaintiff claims to only have gotten three to four hours of sleep on average, plaintiff never testified this was due to work-related interruptions. (*Id.* at 58) ("I read books. Sometimes I'd bake a cake at three o'clock in the morning. Just this and that, do some laundry."). As to the fourth criteria, the uncontroverted record reveals defendant had

a policy of compensating plaintiff for any interruptions occurring during his sleep time. (Curtis Aff. ¶ 12). Finally, the record reveals that under plaintiff's schedule, only seven and a half hours were deducted for sleep time. (*Id.* ¶ 3).

In sum, the court finds defendant implemented its sleep time deduction policy in accordance with the 1988 Policy. At the very least, therefore, defendant acted in good faith by conforming its actions with a written enforcement policy promulgated by the Wage and Hour Division. The record is devoid of any genuine issue of fact, so defendant is entitled to the protection of § 259.

## IV. CONCLUSION

Although the court found defendant was not an arm-of-the-state deserving to share in the state's Eleventh Amendment immunity, the court finds no genuine issue of fact survives for trial and defendant is entitled to judgment as a matter of law. In reaching this conclusion, the court has considered and rejected all of plaintiff's arguments to the contrary.

**IT IS THEREFORE BY THIS COURT ORDERED** that defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Doc. 30) is granted.